297 Ga. 575
FINAL COPY

S14G1192. DUBOIS et al. v. BRANTLEY et al.

BLACKWELL, Justice.

This case presents a question about the qualification of expert witnesses under OCGA § 24-7-702 ("Rule 702"), specifically, what sort of experience is required of a practicing surgeon who is offered as an expert witness in a medical malpractice case to opine that another surgeon breached the applicable standard of medical care in the course of performing a surgical procedure. In Brantley v. Dubois, 327 Ga. App. 14 (755 SE2d 351) (2014), the Court of Appeals held that a surgeon was not qualified as a matter of law under Rule 702 (c) (2) (A) to give expert testimony about negligence in connection with a laparoscopic procedure to repair an umbilical hernia because he had not performed more than one laparoscopic procedure to repair an umbilical hernia in the last five years, notwithstanding that the surgeon had performed many other abdominal laparoscopic procedures during that time. We issued a writ of certiorari to consider whether the Court of Appeals understood Rule 702 (c) (2) (A)

correctly, and we now conclude that it did not. Accordingly, we reverse the judgment of the Court of Appeals.

1. David Dubois was diagnosed with an umbilical hernia, and in March 2011, he underwent a laparoscopic procedure to repair it. Dr. Damon Brantley performed the laparoscopic procedure at a Southeast Georgia Health System hospital in Camden County, and within hours, Dubois was discharged. A couple of days later, however, Dubois returned to the hospital with a fever and other symptoms, and he soon was diagnosed with acute pancreatitis. An exploratory laparotomy revealed that his pancreas had been punctured, which was the likely cause of the pancreatitis. In the days that followed, additional complications arose, including respiratory failure, acute renal failure, and sepsis. Dubois survived these complications, but he spent several days in a coma, was hospitalized in intensive care for almost a month, and had to undergo a number of additional surgeries to repair the damage to his pancreas.

In January 2012, Dubois and his wife filed a lawsuit against Dr. Brantley and Southeast Georgia Health, and they contend that Dr. Brantley negligently

punctured his pancreas with a trocar[1] in connection with the laparoscopic procedure to repair his umbilical hernia. Dr. Brantley admits that he inserted a trocar in the upper abdomen to begin the procedure, and he concedes that attributing the puncture of the pancreas to his use of this trocar is a reasonable hypothesis. Dr. Brantley disputes, however, that his insertion of the primary trocar was a breach of the applicable standard of medical care.

To show that Dr. Brantley was negligent in his use of the trocar, Dubois and his wife offered Dr. Steven E. Swartz as an expert witness. Dr. Swartz is a practicing general surgeon, and in his practice, he uses trocars to perform a variety of abdominal laparoscopic procedures. Although Dr. Swartz has performed laparoscopic procedures to repair umbilical hernias in the past, he testified that he no longer performs that particular sort of laparoscopic procedure, explaining that he now repairs umbilical hernias by open surgery

---

[1] A trocar is a sharp, pointed instrument with a tubular shaft, which is used to puncture the wall of a body cavity. See Dorland's Illustrated Medical Dictionary, p. 1748 (28th ed. 1994). In an abdominal laparoscopic procedure, the surgeon typically makes one or more small incisions in the abdomen, and trocars are inserted through these incisions to penetrate the peritoneum and "provide airtight ports through which instruments may be passed into the abdominal cavity. The trocars also allow surgeons to inflate the patient's abdominal cavity in order to provide space for the doctor to operate." Applied Med. Resources Corp. v. Tyco Healthcare Group, 534 Fed. Appx. 972, 973 (I) (Fed. Cir. 2013).

instead.[2] At his deposition, Dr. Swartz admitted that he has performed no more than one laparoscopic procedure to repair an umbilical hernia in the past five years.[3] Nevertheless, Dr. Swartz opined that, if performed within the applicable standard of medical care, no abdominal laparoscopic procedure — whether to repair an umbilical hernia or for any other purpose — should involve a trocar puncturing the pancreas unless the pancreas is located unusually, anatomically speaking. And Dr. Swartz saw no indication that Dubois has an unusually located pancreas.

To comply with the statutory requirement that an affidavit of a competent expert accompany a complaint for medical or other professional malpractice,[4]

---

[2] Dr. Swartz has offered no opinion in this case that it always is too dangerous to repair an umbilical hernia by a laparoscopic procedure, and indeed, Dr. Swartz admitted that a number of his own partners continue to perform laparoscopic umbilical hernia repairs. Dr. Swartz explained that he does not perform that sort of laparoscopic procedure because he more consistently has experienced better results with open surgeries to repair umbilical hernias. Dr. Swartz faults Dr. Brantley not for choosing to use a laparoscopic procedure on Dubois, but instead for the way in which Dr. Brantley inserted a trocar in the upper abdomen to begin the procedure.

[3] Dr. Swartz testified that he was uncertain whether he had performed any laparoscopic procedures to repair umbilical hernias in the past five years. At most, he said, he might have performed one such procedure.

[4] This requirement is found in OCGA § 9-11-9.1, which provides:
> (a) In any action for damages alleging professional malpractice against:
>> (1) A professional licensed by the State of Georgia and
> listed in subsection (g) of this Code section;
>> (2) A domestic or foreign partnership, corporation,

professional corporation, business trust, general partnership, limited partnership, limited liability company, limited liability partnership, association, or any other legal entity alleged to be liable based upon the action or inaction of a professional licensed by the State of Georgia and listed in subsection (g) of this Code section; or

(3) Any licensed health care facility alleged to be liable based upon the action or inaction of a health care professional licensed by the State of Georgia and listed in subsection (g) of this Code section,

the plaintiff shall be required to file with the complaint an affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim.

(b) The contemporaneous affidavit filing requirement pursuant to subsection (a) of this Code section shall not apply to any case in which the period of limitation will expire or there is a good faith basis to believe it will expire on any claim stated in the complaint within ten days of the date of filing the complaint and, because of time constraints, the plaintiff has alleged that an affidavit of an expert could not be prepared. In such cases, if the attorney for the plaintiff files with the complaint an affidavit in which the attorney swears or affirms that his or her law firm was not retained by the plaintiff more than 90 days prior to the expiration of the period of limitation on the plaintiff's claim or claims, the plaintiff shall have 45 days after the filing of the complaint to supplement the pleadings with the affidavit. The trial court shall not extend such time for any reason without consent of all parties. If either affidavit is not filed within the periods specified in this Code section, or it is determined that the law firm of the attorney who filed the affidavit permitted in lieu of the contemporaneous filing of an expert affidavit or any attorney who appears on the pleadings was retained by the plaintiff more than 90 days prior to the expiration of the period of limitation, the complaint shall be dismissed for failure to state a claim.

(c) This Code section shall not be construed to extend any applicable period of limitation, except that if the affidavits are filed within the periods specified in this Code section, the filing of the affidavit of an expert after the expiration of the period of limitations shall be considered timely and shall provide no basis for a statute of limitations defense.

(d) If a complaint alleging professional malpractice is filed without the contemporaneous filing of an affidavit as permitted by subsection (b) of this

5

Code section, the defendant shall not be required to file an answer to the complaint until 30 days after the filing of the affidavit of an expert, and no discovery shall take place until after the filing of the answer.

(e) If a plaintiff files an affidavit which is allegedly defective, and the defendant to whom it pertains alleges, with specificity, by motion to dismiss filed on or before the close of discovery, that said affidavit is defective, the plaintiff's complaint shall be subject to dismissal for failure to state a claim, except that the plaintiff may cure the alleged defect by amendment pursuant to Code Section 9-11-15 within 30 days of service of the motion alleging that the affidavit is defective. The trial court may, in the exercise of its discretion, extend the time for filing said amendment or response to the motion, or both, as it shall determine justice requires.

(f) If a plaintiff fails to file an affidavit as required by this Code section and the defendant raises the failure to file such an affidavit by motion to dismiss filed contemporaneously with its initial responsive pleading, such complaint shall not be subject to the renewal provisions of Code Section 9-2-61 after the expiration of the applicable period of limitation, unless a court determines that the plaintiff had the requisite affidavit within the time required by this Code section and the failure to file the affidavit was the result of a mistake.

(g) The professions to which this Code section shall apply are:
(1) Architects;
(2) Attorneys at law;
(3) Audiologists;
(4) Certified public accountants;
(5) Chiropractors;
(6) Clinical social workers;
(7) Dentists;
(8) Dietitians;
(9) Land surveyors;
(10) Marriage and family therapists;
(11) Medical doctors;
(12) Nurses;
(13) Occupational therapists;
(14) Optometrists;
(15) Osteopathic physicians;
(16) Pharmacists;
(17) Physical therapists;

Dubois and his wife filed an affidavit by Dr. Swartz with their complaint, and they later amended their complaint by filing a second affidavit by Dr. Swartz.[5] Following the deposition of Dr. Swartz, Dr. Brantley and Southeast Georgia Health moved to dismiss the complaint or, in the alternative, for summary judgment, contending that Dr. Swartz was not competent to offer expert testimony that Dr. Brantley breached the applicable standard of medical care in connection with a laparoscopic procedure to repair an umbilical hernia simply because Dr. Swartz has not regularly performed laparoscopic procedures to

---

(18) Physicians' assistants;
(19) Podiatrists;
(20) Professional counselors;
(21) Professional engineers;
(22) Psychologists;
(23) Radiological technicians;
(24) Respiratory therapists;
(25) Speech-language pathologists; or
(26) Veterinarians.

[5] The law permits a plaintiff to amend his pleadings with the filing of an amended affidavit. See Gala v. Fisher, 296 Ga. 870, 874-875 (770 SE2d 879) (2015). With the original complaint and affidavit, Dubois and his wife pointed generally to negligence in the performance of the laparoscopic repair of his umbilical hernia as the basis for their claims, although the allegations certainly were broad enough to include any negligence in the insertion of the primary trocar. By amending their pleadings with a second affidavit, however, Dubois and his wife clarified that their allegations of negligence specifically concern the insertion of the trocar.

repair umbilical hernias in the past five years. The trial court denied the motion, and Dr. Brantley and Southeast Georgia Health appealed.[6]

The Court of Appeals reversed. In its opinion, the Court of Appeals acknowledged that the qualification of an expert witness under Rule 702 is generally a matter committed to the sound discretion of the trial court. See Brantley, 327 Ga. App. at 16. The Court of Appeals held, however, that the trial court in this case abused its discretion when it qualified Dr. Swartz as an expert witness. The Court of Appeals considered whether Dr. Swartz had participated in laparoscopic procedures to repair umbilical hernias in the past five years, and finding that he had been involved at most in only one such procedure, the Court of Appeals concluded that he was not qualified as a matter of law under Rule 702 (c) (2) (A) to offer any opinion about negligence in connection with a laparoscopic procedure to repair an umbilical hernia:

> Here, there is only speculation that Dr. Swartz performed the procedure in issue in the three to five years prior to the surgery. Even if we accepted that Dr. Swartz performed one laparoscopic umbilical hernia repair in the requisite time period, there otherwise is no showing demonstrating a significant familiarity with the same,

---

[6] When the trial court denied the motion, it issued a certificate of immediate review. Dr. Brantley and Southeast Georgia Health timely filed an application for leave to take an interlocutory appeal, and the Court of Appeals granted their application. See OCGA § 5-6-34 (b).

particularly given the fact that Dr. Swartz had never assisted in such a procedure [during the past five years] and his evident preference [today] for the open surgical approach to repairing an umbilical hernia.

Brantley, 327 Ga. App. at 16-17 (citation omitted). Accordingly, the Court of Appeals held, the trial court erred when it denied the motion to dismiss the complaint or, in the alternative, for summary judgment.

2. Because this case concerns the meaning of Rule 702 (c) (2) (A), we begin with the familiar and settled principles that govern our consideration of the meaning of a statute. "A statute draws its meaning, of course, from its text." Chan v. Ellis, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) (citation omitted). When we read the statutory text, "we must presume that the General Assembly meant what it said and said what it meant," Deal v. Coleman, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (citation and punctuation omitted), and so, "we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." FDIC v. Loudermilk, 295 Ga. 579, 588 (2) (761 SE2d 332) (2014) (citation and punctuation omitted). "The common and customary usages of the words are important, but so is their context." Chan, 296 Ga. at 839 (1) (citations omitted). "For context, we may look to other provisions of the same statute, the structure and history of the

9

whole statute, and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question." May v. State, 295 Ga. 388, 391-392 (761 SE2d 38) (2014) (citations omitted). With these principles in mind, we turn now to the words, structure, and context of Rule 702 (c) (2) (A).

Rule 702 concerns the admissibility of opinion testimony by expert witnesses in civil cases.[7] The usual standard for the admissibility of such testimony is found in Rule 702 (b):

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if:
>> (1) The testimony is based upon sufficient facts or data;
>> (2) The testimony is the product of reliable principles and methods; and
>> (3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact.

---

[7] Rule 702 does not apply in criminal cases. See OCGA § 24-7-702 (a). See also Vaughn v. State, 282 Ga. 99, 101 (3) (646 SE2d 212) (2007) (provisions of former OCGA § 24-9-67.1 (which were carried forward into Rule 702 with the adoption of our new Evidence Code) do not apply in criminal cases).

OCGA § 24-7-702 (b). This standard is based upon Federal Rule of Evidence 702, see Mason v. Home Depot U.S.A., 283 Ga. 271, 279 (5) (658 SE2d 603) (2008), and it requires a trial court to sit "as a gatekeeper and assess the reliability of proposed expert testimony," An v. Active Pest Control South, 313 Ga. App. 110, 115 (720 SE2d 222) (2011) (citations omitted), applying the principles identified in Daubert v. Merrell Dow Pharmaceuticals, 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993), and its progeny. See OCGA § 24-7-702 (f). See also HNTB Ga. v. Hamilton-King, 287 Ga. 641, 642-643 (1) (697 SE2d 770) (2010). Rule 702 (b) applies in civil cases generally, including cases involving professional malpractice.

Rule 702 (c) sets forth an additional requirement for the admission of expert testimony about the applicable standard of care in all professional malpractice cases, including medical malpractice cases. See Hankla v. Postell, 293 Ga. 692, 696 (749 SE2d 726) (2013). In a professional malpractice case, an expert on the standard of care must have been "licensed by an appropriate regulatory agency to practice his or her profession . . . or teaching in the profession" at the time of the alleged negligence at issue. OCGA § 24-7-702 (c) (1). For medical malpractice cases in particular, Rule 702 (c) (2) sets out still

11

more requirements for the admission of expert testimony about the standard of care. Rule 702 (c) (2) (C) requires that an expert in a medical malpractice case generally must be "a member of the same profession" as the defendant about whose alleged malpractice the expert will testify. OCGA § 24-7-702 (c) (2) (C) (i).[8]

In addition, Rule 702 (c) (2) (A) and (B) provide that an expert on the standard of care in a medical malpractice case must have a particular sort of knowledge and experience, either by virtue of having recently practiced the profession (Rule 702 (c) (2) (A)) or having recently taught it (Rule 702 (c) (2) (B)). More specifically, Rule 702 (c) (2) (A) and (B) require that such an expert

> . . . had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result having been regularly engaged in:
>> (A) The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue; or

---

[8] There are a number of exceptions to this requirement, which are identified in Rule 702 (c) (2) (C) (ii), (C) (iii), and (D). None of those exceptions, however, are important for our present purposes, and we will not, therefore, discuss them further today.

12

(B) The teaching of his or her profession for at least three of the last five years as an employed member of the faculty of an educational institution accredited in the teaching of such profession, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in teaching others how to perform the procedure, diagnose the condition, or render the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue . . . .

OCGA § 24-7-702 (c) (2). These are the provisions with which we are principally concerned in this case.

According to Dr. Brantley and Southeast Georgia Health, the provisions of Rule 702 (c) (2) (A) and (B) require that an expert on the standard of medical care with respect to a particular surgical procedure must have actually performed or taught that same surgical procedure in three of the past five years. After all, they argue, the statute explicitly requires that the expert have been actively involved in practice or teaching "with sufficient frequency . . . in performing the procedure [or] teaching others how to perform the procedure." And, they say, the relevant "procedure" in this case is a laparoscopic procedure to repair an umbilical hernia. Because Dr. Swartz has performed no more than one laparoscopic procedure to repair an umbilical hernia in the past five years, they reason, his testimony does not satisfy the requirements of Rule 702 (c) (2) (A)

13

as a matter of law, and the trial court had no discretion to find otherwise. As we read its opinion, the Court of Appeals understood the statute in just this way. See Brantley, 327 Ga. App. at 16-17. There are two fundamental problems with this understanding of the statute.

To begin, Rule 702 (c) (2) (A) and (B) do not define exactly what is meant by "procedure." In its ordinary and everyday usage, "procedure" refers to a process, method, or series of steps undertaken for the accomplishment of an end. See, e.g., American Heritage Dictionary of the English Language at 1444 (3rd ed. 1992); Webster's Third New International Dictionary at 1807 (1969). And as the term is used in the statute, "procedure" clearly refers to the "procedure . . . which is alleged to have been performed . . . negligently by the defendant whose conduct is at issue." OCGA § 24-7-702 (c) (2) (A), (B). Everyone in this case agrees about the generalized sense in which the word is used in the statute and the identity of the procedure to which it refers. That is not the difficulty.

Rather, the difficulty with the statutory usage of "procedure" concerns the level of generality at which the relevant procedure is to be defined. By way of illustration, suppose that someone pointed out a dog and asked: "What sort of animal is that?" Animals can be classified at varying levels of generality, and so,

14

you might accurately respond that the animal is a vertebrate, a mammal, of the order Carnivora, of the family Canidae, of the genus Canis, of the species Canis lupus, or of the subspecies Canis lupus familiaris. See Integrated Taxonomic Information System.[9] More specific yet, you might identify the dog by its breed, gender, or some other distinguishing, immutable characteristic. Every one of these answers would amount to an accurate response to the question.

In the same way, a medical "procedure" can be identified at varying levels of generality. Take the procedure at issue in this case. It could be accurately characterized just as the Court of Appeals, Dr. Brantley, and Southeast Georgia Health characterized it, as a "laparoscopic procedure to repair an umbilical hernia." Characterized in that way, the record is clear that Dr. Swartz has performed no more than one such procedure in the past five years. The procedure could, however, be characterized more generally — but just as accurately — as the surgical repair of an umbilical hernia or as an abdominal laparoscopic procedure. Under either of those characterizations, Dr. Swartz would have actual experience performing the procedure in question, inasmuch

_____

[9] Available at http://www.itis.gov, visited on June 30, 2015.

as he regularly performs surgical procedures to repair umbilical hernias, and he regularly performs abdominal laparoscopic procedures of various sorts.

Because not all laparoscopic procedures to repair umbilical hernias are done in exactly the same way, the procedure also could be characterized more specifically than — but just as accurately as — the way in which the Court of Appeals, Dr. Brantley, and Southeast Georgia Health characterized it. Indeed, the medical literature indicates that laparoscopic surgeons use a variety of techniques to enter into the abdominal cavity, they use different points of entry to access the abdominal cavity, and they use different numbers of trocars, as well as trocars of different sorts and sizes, to do so. See Fuller et al., Laparoscopic Trocar Injuries: A Report from a U. S. Food and Drug Administration Center for Devices and Radiological Health (CDRH) Systematic Technology Assessment of Medical Products (STAMP) Committee (Nov. 2003).[10] See also Heniford & Ramshaw, "Laparoscopic Ventral Hernia Repair," 14 Surgical Endoscopy 419, 420 (2000). With respect to laparoscopic procedures to repair umbilical hernias specifically, the literature likewise indicates variations in techniques and tools. See Rodriguez & Hinder, "Surgical

---

[10] Available at http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/, visited on June 30, 2015.

16

Management of Umbilical Hernia," Operative Techniques in General Surgery, Vol. 6, No. 3 at 160 (Sept. 2004); Wright et al., "Is laparoscopic umbilical hernia repair with mesh a reasonable alternative to conventional repair?," 184 Am. J. of Surgery 505, 506 (2002). And the record in this case confirms the variability of techniques and tools used in the laparoscopic repair of umbilical hernias. As a result, the "procedure" in this case could be defined, one reasonably might say, as specifically as a laparoscopic procedure to repair an umbilical hernia by use of a particular number of trocars of a certain size and design, with the primary trocar having been inserted by a specific technique at a particular site.

The Court of Appeals, Dr. Brantley, and Southeast Georgia Health characterized the procedure in question at an intermediate level of generality, and Dr. Brantley and Southeast Georgia Health insist that it must be so characterized. They have not explained, however, why that is the case, and the reason for such a rule is not self-evident. As we said, Rule 702 does not define "procedure," and standing alone, the word does not resolve the question about the level of generality at which the procedure at issue is to be identified.

Moreover, nothing else in the statute points clearly and precisely to the level of generality at which the relevant procedure ought to be characterized.

That brings us to the second fundamental problem with the way in which the Court of Appeals, Dr. Brantley, and Southeast Georgia Health understand the statute. If they were right that Rule 702 (c) (2) (A) and (B) absolutely require that an expert have performed or taught exactly the same procedure as that at issue, we would have to determine definitively the level of generality at which the procedure should be characterized, insofar as the characterization of the procedure would be dispositive in many cases, perhaps including this one. But as it turns out, we need not resolve that question to decide this case because the Court of Appeals, Dr. Brantley, and Southeast Georgia Health are simply wrong.[11]

A careful reading of the text shows that Rule 702 (c) (2) (A) and (B) do not require that an expert actually have performed or taught the very procedure at issue. Rather, these provisions require only:

---

[11] Although we need not answer that question definitively, the fact that Rule 702 does not seem to point to any particular level of generality at which the "procedure" in question is to be characterized suggests strongly to us that the level of generality is not crucial to the pertinent inquiry under Rule 702. If it were, after all, one would expect the statute to speak to it. That the statute does not leads us to think that perhaps the Court of Appeals, Dr. Brantley, and Southeast Georgia Health were wrong about the pertinent inquiry.

- That the expert has "actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given";

- That this "actual professional knowledge and experience" is derived from the expert "having been regularly engaged in . . . [t]he active practice of such area of specialty . . . for at least three of the last five years . . . [or] [t]he teaching of his or her profession for at least three of the last five years as an employed member fo the faculty of an educational institution accredited in the teaching of such profession"; and

- That the expert has been "regularly engaged in [active practice or teaching] with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure . . . [or] teaching others how to perform the procedure."

OCGA § 24-7-702 (c) (2) (A), (B). No doubt, the simplest way to demonstrate that an expert has "an appropriate level of knowledge . . . in performing [a] procedure . . . [or] teaching others how to perform [a] procedure" is by proof that the expert actually has done these things himself. Moreover, it may be that, in many cases, if an expert has not actually performed or taught a procedure himself, he will be found lacking "an appropriate level of knowledge." But by the plain terms of the statute, the pertinent question is whether an expert has "an appropriate level of knowledge . . . in performing the procedure . . . [or] teaching others how to perform the procedure," not whether the expert himself has actually performed or taught it. If the General Assembly had meant to require

19

absolutely that the expert actually have performed or taught the procedure in question, it presumably would have said so. See <u>Deal</u>, 294 Ga. at 172 (1) (a).

Rule 702 (c) (2) (A) and (B) refer to "performing the procedure" and "teaching others how to perform the procedure" merely as the subjects of which an expert witness must have an "appropriate level of knowledge, as determined by the judge." Used in this way, "appropriate" means "suitable or fitting for a particular purpose," <u>Tapia v. United States</u>, ___ U. S. ___ (III) (A) (131 SCt 2382, 180 LE2d 357) (2011) (citation omitted), and so, the statute speaks of a "level of knowledge" that is "suitable or fitting for a particular purpose." But what purpose? Considering the "appropriate level of knowledge" requirement in context, it must mean, we conclude, knowledge suitable or fitting for the rendering of the particular opinions to which the expert proposes to testify.

The whole premise of Rule 702 is that a trial court must act as a "gatekeeper" to ensure the relevance and reliability of expert testimony. See <u>HNTB Ga.</u>, 287 Ga. at 645 (2) (citation omitted). That purpose is served in all cases by the general standard for the admission of expert testimony in Rule 702 (b), but it is served as well by Rule 702 (c), which sets forth more particularized requirements for all professional malpractice cases in paragraph (c) (1), and for

medical malpractice cases specifically in paragraph (c) (2). These requirements appear to have been designed to promote an assessment of relevance and reliability in the specific cases in which the provisions of Rule 702 (c) apply. Considering the rapid pace with which the state of the art advances in the field of medicine, and given the high degree of specialization in the practice of medicine, Rule 702 (c) (2) accounts for the reality that the standards of medical care are likely to evolve over time, and they may vary in important ways from specialty to specialty. The requirements of Rule 702 (c) (2) ensure that an expert on the standard of care in a medical malpractice case has an informed basis for testifying about the standard of care that presently prevails in the specific profession and specialty at issue. To be sure, that the trial court sits as a gatekeeper to ensure relevance and reliability is the very idea behind Daubert and its progeny, see Kumho Tire Co. v. Carmichael, 526 U. S. 137, 152 (II) (B) (119 SCt 1167, 143 LE2d 238) (1999), and the General Assembly has said that the courts should look to Daubert and its progeny in "interpreting and applying" Rule 702 as a whole, not just in "interpreting and applying" the general standard set out in subsection (b). OCGA § 24-7-702 (f). And Rule 702 (c) (2) (A) and (B) refer explicitly to the gatekeeper role of the trial court, speaking in terms of

21

"an appropriate level of knowledge, *as determined by the judge.*" OCGA § 24-7-702 (c) (2) (A), (B) (emphasis supplied). Just as we explained in <u>Nathans v. Diamond</u>, 282 Ga. 804, 806 (1) (654 SE2d 121) (2007), Rule 702 (c) (2) (A) and (B) are "intended to require a plaintiff to obtain an expert who has significant familiarity with the area of practice in which the expert opinion is to be given." To put it another way, Rule 702 is designed to ensure that an expert genuinely knows of that of which he speaks.[12]

This recognition that Rule 702 (c) (2) (A) and (B) implicate the gatekeeper role of the trial court tells us something important about the nature of the inquiry into the qualification of an expert witness under those provisions. As the United States Supreme Court explained in <u>Daubert</u>, the gatekeeper role contemplates that a trial court will conduct an inquiry that is "flexible," 505 U. S. at 594 (II) (C), and that is tailored specifically to the peculiar opinions to which the expert proposes to testify in that case, inquiring about the extent to which those

---

[12] That Rule 702 (c) (2) (A) and (B) implicate the gatekeeping function of the trial court does not mean that those provisions are mere suggestions to guide a trial court in its application of the general standard set out in Rule 702 (b). The requirements of Rule 702 (c) (2) (A) and (B) are just that, requirements, and as we said in <u>Nathans</u>, "even if [an] expert is generally qualified as to the acceptable standard of conduct of the medical professional in question, the expert cannot testify unless he also satisfies the specific requirements of [paragraph] (c) (2)." 282 Ga. at 806 (1). Our point is only that the more particularized requirements of Rule 702 (c) are intended to serve the same essential purpose as the generalized standard of Rule 702 (b).

opinions have a basis in sound scientific principles and methodologies. See id. at 592-593 (II) (C). Just as an assessment of admissibility under Rule 702 (b) must begin with the specific opinions at issue, so too must a consideration of the "appropriate level of knowledge" under Rule 702 (c) (2) (A) and (B). We hold that an expert has an "appropriate level of knowledge . . . in performing the procedure" to the extent that the expert has sufficient knowledge about the performance of the procedure — however generally or specifically it is characterized, so long as it is the procedure that the defendant is alleged to have performed negligently — to reliably give the opinions about the performance of the procedure that the expert proposes to give.

To illustrate a proper application of these principles, consider a cardiovascular surgeon, who is offered as an expert on the standard of care with respect to a particular sort of heart surgery. The surgeon has not performed any surgeries of that particular sort, but she has performed many other heart surgeries. Whether her experience has given the surgeon an "appropriate level of knowledge . . . in performing the procedure" depends upon exactly what opinions the surgeon is expected to share in her testimony. If she proposes to testify about an aspect of the surgery in question that is unique and materially

23

unlike the heart surgeries with which she has experience, her limited experience likely will be a problem for the admissibility of her testimony. But if she proposes only to testify about an aspect of the surgery that is — as shown by the record — not different in any material way from the surgeries with which she has experience, she might well be found to have an "appropriate level of knowledge" by virtue of her practical experience. Whether the experience of a particular expert witness is enough to establish that the expert has an "appropriate level of knowledge" is a question committed to the discretion of the trial court.

Our decision in <u>Nathans</u> hints at this sort of flexible approach. There, we considered whether the trial court abused its discretion when it concluded that a pulmonologist was not competent under Rule 702 (c) (2) (A) to opine about the applicable standard of care for obtaining informed consent in connection with an otolaryngological surgery to treat obstructive sleep apnea. In our consideration of this question, we did not inquire whether the pulmonologist himself had performed precisely the same sort of surgery. Rather, we asked whether the pulmonologist had "performed surgeries *like* the one in question," whether he had "obtained informed consent for *similar* surgeries," and whether

"the surgeries that he ha[d] performed involved risks that are *similar to* the risks involved with the surgery that [the defendant surgeon] performed in the present case." 282 Ga. at 807 (1) (emphasis supplied).

Here, the Court of Appeals appears to have thought that Dr. Swartz was not competent to offer any opinion about a laparoscopic procedure to repair an umbilical hernia simply because he had not been involved in the past five years with more than one such procedure. The Court of Appeals failed, however, to consider the limited scope of the negligence alleged by Dubois and his wife in their amended complaint, the limited nature of the opinions that Dr. Swartz proposes to give, the similarities and dissimilarities between laparoscopic repairs of umbilical hernias and the other sorts of abdominal laparoscopic procedures with which Dr. Swartz indisputably has substantial experience, and the extent to which the differences between the various abdominal laparoscopic procedures are significant for the purposes of assessing the relevance and reliability of the particular opinions to which Dr. Swartz will testify in this case. The Court of Appeals, therefore, misapplied Rule 702 (c) (2) (A).

As Dubois and his wife have conceded in this Court, they now have narrowed their allegations of negligence on the part of Dr. Brantley in the

25

performance of the laparoscopic umbilical hernia repair to contend only that he was negligent with respect to the insertion of the primary trocar. Dr. Swartz proposes to testify only that Dr. Brantley breached the applicable standard of care by his insertion of the primary trocar to commence the laparoscopic procedure. Although Dr. Swartz in recent years has given up laparoscopic procedures to repair umbilical hernias, the record shows that he still regularly performs numerous other laparoscopic procedures in the abdominal cavity, and as a part of these other procedures, Dr. Swartz regularly inserts primary trocars like the one used by Dr. Brantley in this case. There is some evidence in the record from which the trial court might reasonably have found that, notwithstanding the many differences among the several varieties of abdominal laparoscopic procedures, they do not differ in any important way with respect to the accepted standards for the insertion of the primary trocar. Significantly, Dr. Brantley points to nothing in the record that suggests that the ways in which the primary trocar may be inserted for the purpose of a laparoscopic umbilical hernia repair are somehow unique and different in any meaningful respect from the ways in which the primary trocar may be inserted for other sorts of abdominal laparoscopic procedures. And although laparoscopic surgeons may

26

employ a variety of techniques and tools, Dr. Brantley fails to show that he inserted the primary trocar by use of a technique or tool that is unfamiliar to Dr. Swartz or unlike the techniques and tools that Dr. Swartz employs in his own practice. For these reasons, the trial court properly could have concluded that Dr. Swartz has experience enough to establish a reliable basis for the opinions that he proposes to render, and on this record, it cannot be said that the trial court abused its discretion when it found that Dr. Swartz had an "appropriate level of knowledge . . . in performing the procedure" to opine under Rule 702 (c) (2) (A) that Dr. Brantley was negligent when he inserted the primary trocar.[13] The Court of Appeals erred when it concluded otherwise, and we reverse its judgment.

Judgment reversed. All the Justices concur.

---

[13] We hold only that it was no abuse of discretion for the trial court on the existing record to find that Dr. Swartz is qualified under Rule 702 (c) (2) (A) to give the particular opinions that he has proposed to give. We do not hold that it would have been an abuse of discretion for the trial court to find otherwise. And we do not hold that it would be permissible for Dr. Swartz to give other opinions about the laparoscopic procedure performed by Dr. Brantley. His limited experience in the past five years in performing laparoscopic repairs of umbilical hernias might well leave him without a reliable basis upon which to offer opinions about aspects of the procedure other than the primary trocar insertion, but that is not an issue that we decide today.

Decided July 13, 2015 – Reconsideration denied July 27, 2015.

Certiorari to the Court of Appeals of Georgia – 327 Ga. App. 14.

Franklin, Taulbee, Rushing, Snipes & Marsh, James B. Franklin; Savage & Turner, Brent J. Savage, Kathryn H. Pinckney, for appellants.

Hall, Booth, Smith, Charles A. Dorminy, Norman D. Lovein, William S. Mann, for appellees.