**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 19, 2022**

# In the Court of Appeals of Georgia

A22A0378. RUSSELL et al. v. KANTAMNENI et al.

BROWN, Judge.

In this medical malpractice action arising out of an alleged failure to diagnose lupus, Allison and Thomas Russell ("the parents") appeal from the superior court's order granting Dr. Arun Kantamneni and Insight Psychiatric Services, Inc.'s (collectively "the defendants") motion to dismiss based upon OCGA § 9-11-9.1. The parents contend that the trial court erred by concluding that the affidavit of their expert, Dr. Putterman, could not be used to satisfy their obligation under OCGA § 9-11-9.1. For the reasons explained below, we agree and therefore reverse.

Under OCGA § 9-11-9.1 (a), the plaintiff in a professional malpractice action is required to attached to the complaint the "affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or

omission claimed to exist and the factual basis for each such claim." OCGA § 24-7-702 (e) mandates that an expert must meet the requirements of OCGA § 24-7-702 "in order to be deemed qualified to testify as an expert by means of the affidavit required under Code Section 9-11-9.1." "Under OCGA § 24-7-702, it is the role of the trial court to act as a gatekeeper of expert testimony." *Yugueros v. Robles*, 300 Ga. 58, 67 (793 SE2d 42) (2016).

> The qualification of an expert witness under [OCGA § 24-7-702] is generally a matter committed to the sound discretion of the trial court. Although an appellate court usually reviews a trial court's order on a motion to dismiss de novo, when the trial court has held a hearing on the competency of a witness to give affidavit testimony in compliance with OCGA § 9-11-9.1, our review determines only whether the trial court has abused [its] discretion. . . . [I]t is irrelevant whether or not evidence was offered at the hearing.

(Citations and punctuation omitted.) *Graham v. Reynolds*, 343 Ga. App. 274, 276-277 (2) (807 SE2d 39) (2017).

In this case, the parents' complaint alleges that their 18-year-old daughter, Elianna Russell, "died from complications from [l]upus" on June 25, 2019. With regard to Dr. Kantamneni's alleged negligence, the complaint asserts that Elianna came under his care during a hospital admission that began on December 15, 2018,

2

and that his negligence caused injury resulting in her death as outlined in the affidavit of Dr. Putterman attached to the complaint. Dr. Putterman is an internal medicine doctor "with a specialty in [r]heumatology. . . ."

In the affidavit attached to the original complaint, Dr. Putterman averred that he has

> regularly treated many patients with autoimmune diseases, such as [l]upus, either diagnosed prior to my medical involvement or diagnosed under my medical care and treatment. Furthermore, throughout my medical career, to include from 2010 to date, I have regularly provided medical care and treatment directly, or served as a senior consultant, to include diagnosis, to many patients, such as Elianna Russell, as she presented in 2018 and 2019 to the medical care of the individual [d]efendants in this lawsuit, specifically, . . . [Dr.] Kantamneni. . . .

He opined that Dr. Kantamneni "deviated from the requisite standard of care by not recognizing and ensuring timely treatment of Elianna Russell for [l]upus in view of the available information, to include, but not limited to, her age, gender, race, family history, episodes of psychosis, pantocytopenia and abnormal ANA and anti-dsDNA laboratory findings."

Defendants moved to dismiss the parents' complaint, asserting that Dr. Putterman, a rheumatologist, "cannot provide standard of care opinions as to the

psychiatric care provided by Dr. Kantamneni" and that Dr. Putterman's affidavit "fails to specifically describe the actual negligent conduct attributed to Dr. Kantamneni or the factual bases for [his] opinions." The parents filed an amended complaint with a much more detailed affidavit from Dr. Putterman regarding Dr. Kantamneni's alleged negligence.

In this affidavit, Dr. Putterman averred that he was familiar with the "medical care and skill exercised by doctors generally, to include . . . [p]sychiatrists . . . under the same and similar . . . surrounding conditions as those presented by Elianna Russell in 2018 and 2019 to [Dr. Kantamneni]" and that "[f]rom the mid-1990s to the present and on a yearly basis, I have regularly and frequently treated many patients with autoimmune diseases such as . . . lupus . . . , either diagnosed prior to my medical involvement or diagnosed under my medical care and treatment." He explained that lupus is more prevalent and severe in 15-to-45-year-old females, especially in the minority population to which Elianna belonged; that psychosis and pantocytopenia are classic signs of lupus; and that lupus can be ruled out by ANA and anti-dsDNA antibody tests because "an elevated anti-dsDNA finding is essentially conclusive of [l]upus." He stated:

4

As taught in medical school and as known by any doctor who evaluates and/or treats patients, there are widely accepted and employed classification criteria (signs and symptoms) for [l]upus. . . . Since the criteria for [l]upus cover a wide area of signs and symptoms, a broad array of [p]rimary [c]are [p]hysicians and specialists are typically the first to encounter and examine such a patient, and therefore are required, pursuant to the requisite standard of care, to recognize the potential for [l]upus and refer the patient to a specialist, such as a [r]heumatologist, for further work up and evaluation. . . . The doctors who should understand the classification and criteria for [l]upus would, without question, include [p]rimary [c]are [p]hysicians, [h]ematologists, [p]sychiatrists, and [f]amily [p]ractice [p]hysicians, among other specialists.

With regard to Elianna's treatment, Dr. Putterman stated that Elianna was sent to the hospital from a behavioral health center to determine if her psychosis was the result of physiological causes rather than being purely psychiatric in nature; that Dr. Kantamneni began evaluation and treatment of Elianna five days after her admission (December 20, 2018) and four days before she was discharged; that a nurse practitioner "apparently [ ] associated" with Dr. Kantamneni charted on December 22, 2018, that Elianna's father described a family history of lupus and suggested that Elianna be evaluated for lupus; that Dr. Kantamneni reviewed this entry on December 27, 2018, three days after Elianna was discharged from the hospital; that Elianna was

5

correctly diagnosed with pantocyptopenia after her admission and her ANA was elevated on December 24, 2018, and her anti-dsDNA was abnormally elevated on December 25, 2018; that no doctor responded to these abnormal test results, including Dr. Kantamneni; and that Dr. Kantamneni never charted a potential for lupus or referred Elianna for an evaluation for lupus.

According to Dr. Putterman, Elianna's "psychosis symptoms subsided with time," but returned in June 2019. Following a second hospitalization in a different facility, she was immediately started on a treatment for lupus, but she died of "organ failure from [l]upus" as a result of Dr. Kantamneni's failure "to ensure timely treatment and follow[-]up."

After holding a hearing on the motion, the trial court granted defendants' motion to dismiss, reasoning as follows:

> Dr. Putterman's affidavits and CV certainly indicate a requisite level of expertise in rheumatology and the diagnosis and treatment of autoimmune disorders, including [l]upus. However, although he has worked with psychiatrists in the treatment of [l]upus patients in a hospital setting, he does not indicate having practiced as a psychiatrist nor having a specialized knowledge of the standard of care of psychiatrists. While a doctor of one medical specialty may have sufficient expertise or experience to opine about the appropriate standard of care of a different medical specialty, the Court does not find

6

that to be the case here. Therefore, . . . the Court finds [the parents] have not submitted a sufficient expert medical affidavit in this case under OCGA § 9-11-9.1 as to [Dr.] Kantamneni.

On appeal, the parents contend that the trial court misinterpreted the requirements of OCGA § 24-7-702 when determining whether Dr. Putterman was qualified to render an opinion in this case. OCGA § 24-7-702 (c) (2) (C) (i) "requires that an expert in a medical malpractice case generally must be 'a member of the same profession' as the defendant about whose alleged malpractice the expert will testify." *Dubois v. Brantley*, 297 Ga. 575, 581 (2) (775 SE2d 512) (2015). As both Dr. Putterman and Dr. Kantamneni are medical doctors, this requirement is satisfied. See *Graham v. Reynolds*, 343 Ga. App. 274, 278 (2) (a) (807 SE2d 39) (2017).

Defendants contend that Dr. Putterman's opinions failed to satisfy a different portion of OCGA § 24-7-702, which provides:

[I]n [medical] malpractice actions, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert:

. . .

7

had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:

> (A) The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in . . . diagnosing the condition[ ] or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue[.]

OCGA § 24-7-702 (c) (2) (A). With regard to the requirement that the expert have "actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given," OCGA § 24-7-702 (c) (2), the Supreme Court of Georgia has explained that this language

> means that the plaintiff's expert does not have to have knowledge and experience in the same area of practice/specialty as the defendant doctor. Instead, under the foregoing language, the issue is whether the expert has knowledge and experience in the practice or specialty that is relevant to the acts or omissions that the plaintiff alleges constitute malpractice and caused the plaintiff's injuries.

8

(Citations and punctuation omitted.) *Nathans v. Diamond*, 282 Ga. 804, 806 (1) (654 SE2d 121) (2007). "In this context, the area of specialty is dictated by the allegations in the complaint, not the apparent expertise of the treating physician." (Citation and punctuation omitted.) *Mekoya v. Clancy*, 360 Ga. App. 452, 460 (1) (861 SE2d 409) (2021).

In this case, the parents' complaint asserts that Dr. Kantamneni violated the standard of care by not recognizing and ensuring timely treatment of Elianna for lupus. As the trial court acknowledged in its order, "Dr. Putterman's affidavit and CV certainly indicate a requisite level of expertise in . . . the diagnosis and treatment of autoimmune disorders, including [l]upus." It follows that the trial court concluded that Dr. Putterman fulfilled the requirement of OCGA § 24-7-702 (c) (2). *Mekoya*, 260 Ga. App. at 460 (1).

The final hurdle for consideration of Dr. Putterman's affidavit is whether he engaged in the active practice of diagnosing and treating lupus for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, *as determined by the judge*, in diagnosing and treating lupus. See OCGA § 24-7-702 (c) (2) (A). As outlined above, Dr. Putterman's affidavit stated that beginning in the mid-1990s through the time of his affidavit "and on a yearly basis,

[he had] regularly and frequently treated many patients with autoimmune diseases such as [lupus], either diagnosed prior to my medical involvement or diagnosed under my medical care and treatment." Additionally, from 1997 through the time of his affidavit "and on a yearly basis, [he has] regularly provided care and treatment directly, or served as a senior consultant physician, to include diagnosis, to many patients in hospital and clinical settings under similar circumstance as those involving Elianna Russell, as she presented in 2018 . . . to the medical care of [Dr. Kantamneni]." The defendants urge this Court to affirm the trial court because "yearly" does not meet the sufficient frequency requirement of OCGA § 24-7-702 (c) (2) (A). But the trial court did not conclude that Dr. Putterman's experience lacked sufficient frequency in the diagnosis and treatment of lupus. Instead, it is clear from reading the entirety of the trial court's order that it concluded that Dr. Putterman had the "requisite level of experience" other than "having practiced as a psychiatrist [or] having a specialized knowledge of the standard of care of psychiatrists."

Having reviewed the allegations of the complaint, Dr. Putterman's affidavits, and the trial court's conclusions with regard to whether Dr. Putterman's affidavit could be used to satisfy the requirements of OCGA § 9-11-9.1, we conclude that it abused is discretion by concluding the affidavit was insufficient and granting

10

defendants' motion to dismiss. Dr. Putterman was not required to practice as a psychiatrist or have specialized knowledge of the standard of care of psychiatrists to satisfy the requirements of OCGA§ 9-11-9.1 and OCGA § 24-2-702 (c) (2) (C). See *Mekoya*, 360 Ga. App. at 457-461 (1) (cardiologist qualified to testify about hospitalist's failure to diagnose a specific medical condition; cardiologist not required to practice hospitalist medicine); *Graham*, 343 Ga. App. at 278-279 (2) (b) (cardiologist qualified to testify about standard of care in diagnosing myocardial infarction in case alleging malpractice by emergency physician; cardiologist did not need experience "in the area of emergency medicine"); *Toombs v. Acute Care Consultants*, 326 Ga. App. 356, 357-360 (756 SE2d 589) (2014) (physical precedent only) (reversing trial court's disqualification of expert where "trial court confused Georgia law as to the specialty or practice of medicine relevant to [the] case"; expert was qualified to render opinion on evaluation, diagnosis, and treatment of patient at increased risk of deep vein thrombosis and pulmonary embolism despite alleged lack of expertise in "treatment of post-surgical burn care patient who had undergone skin graft surgery").

None of the decisions relied upon by the defendants require a different result. Our decision in *Bonds v. Nesbitt*, 322 Ga. App. 852 (747 SE2d 40) (2013), was

11

decided before the Supreme Court of Georgia's opinion in *Dubois*, which clarified the requisite analysis under OCGA § 24-7-702 (c) (2). See 297 Ga. at 587 (2). In *Nathans*, the Supreme Court of Georgia addressed whether an expert had the requisite experience in the type of surgery performed by the defendant doctor and the requisite risks of which a patient should be advised. 282 Ga. at 806-807 (1). It did not involve a failure to diagnose or treat like the instant case. Additionally, it was also decided before the Supreme Court of Georgia's clarification in *Dubois*. See *White v. State*, 305 Ga. 111, 122 (3), n.10 (823 SE2d 794) (2019) ("When a high court finds discordant opinions among its own horizontal precedents, the court generally follows its decision in the most *recent* case, which must have tacitly overruled any truly inconsistent holding.") (Citations and punctuation omitted; emphasis in original).

*Judgment reversed. Barnes, P. J., and Hodges, J., concur.*