**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**August 19, 2022**

# In the Court of Appeals of Georgia

A22A0913. HOWELL et al. v. COCHRAN.

BROWN, Judge.

Robert Howell and Georgia Hand, Shoulder & Elbow, P.C. (collectively "the defendants") appeal from the trial court's denial of their motion for summary judgment in this medical malpractice action filed by Corey Cochran. The defendants contend that the trial court erred in concluding that Cochran's medical expert was qualified to testify under OCGA § 24-7-702 (c). For the reasons explained below, we disagree and affirm.

"We apply a de novo standard of review to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." (Citation and punctuation omitted.) *Ashton Atlanta Residential v. Ajibola*, 331 Ga. App. 231, 232

(770 SE2d 311) (2015). So viewed, the evidence shows that on January 8, 2016, Cochran was a patient at Piedmont Hospital after severing three fingers on his left hand: his index, long or middle, and ring fingers. Dr. Howell performed a replantation procedure wherein he successfully reattached the index and long fingers but was unable to reattach the ring finger. According to Cochran's complaint, a few weeks after the procedure, he "realized that his fingers were incorrectly attached, with the amputated portion of the index finger replanted on the long finger and the amputated portion of the long finger replanted on the index finger."[1] In April 2016, Cochran brought this to Dr. Howell's attention, but Dr. Howell "denied any wrong-doing."

Cochran filed a renewal suit against the defendants in 2018, alleging medical malpractice and negligence.[2] The complaint alleged that Dr. Howell failed to exercise a reasonable degree of care and skill during the surgery, including "making certain that [Cochran's] fingers were reattached in the correct order," and that Dr. Howell's

---

[1] A certified latent print examiner compared Cochran's pre-operative fingerprints to his post-operative fingerprints and concluded "to an absolute degree of certainty" that Cochran's "left index and left middle fingers . . . have been re[ ]attached in the incorrect order[.]" The defendants have not admitted that the amputated portions of the fingers were translocated.

[2] Cochran also filed suit against Piedmont Hospital, Inc., and Dr. Harlan Starr, but voluntarily dismissed his complaint with prejudice against these defendants.

2

treatment of Cochran fell below the standard of care by transposing Cochran's severed finger tips during the procedure and failing to recognize the error even after Cochran questioned him about it post-operatively. The complaint further alleged that Dr. Howell "negligently fail[ed] to replant[ ] [Cochran's] index and middle fingers in the correct position" and breached his duty of care "when [he] failed to label [Cochran's] severed fingers correctly prior to surgery" or "failed to supervise [others] as they verified [Cochran's] fingers were labeled correctly." To comply with the statutory requirement that an affidavit of a competent expert accompany a complaint for medical or other professional malpractice, OCGA § 9-11-9.1 (a), Cochran attached to his complaint the affidavit of Dr. Mirsad Mujadzic.

Thereafter, the defendants filed a motion to exclude Dr. Mujadzic as Cochran's expert and for summary judgment on the grounds that Cochran failed to make Dr. Mujadzic available for deposition. In response, Cochran's attorney submitted an affidavit in which he averred that he put forth every effort to locate and provide Dr. Mujadzic to be deposed. Dr. Mujadzic failed to return any of the attorney's calls despite assurances from his office that he would. Cochran's attorney averred that despite his efforts, he was never able to speak with Dr. Mujadzic. Accordingly, the attorney began searching for a new expert, but "[g]iven the unique skill set

3

[involved], it was extremely difficult . . . to locate a new expert." The attorney eventually identified and disclosed Dr. Martin Morse as Cochran's expert.

In his February 2020 deposition, Dr. Morse testified that he is a board certified plastic surgeon, specifically a general plastic and reconstructive surgeon, and has owned a plastic surgery practice titled "Morse Hand and Plastic Surgery" since 1999. Dr. Morse testified that his practice is 25 percent general plastic and reconstructive surgery and 75 percent hand surgery or "hand related." Dr. Morse completed a hand fellowship but did not obtain subspecialty certification in hand surgery. While serving in the military, Dr. Morse gave "a number of lectures . . . related to hand injuries," including replantations and amputations.

At the time of the deposition, Dr. Morse was on staff at five hospitals, taking trauma calls at two of them. Dr. Morse previously was on "hand call" and the "replantation call schedule" at one of the larger hospitals, during which the majority of his replantation surgeries were performed. In the 5 years preceding Cochran's procedure in 2016, Dr. Morse estimated that he performed around 15 finger replantation procedures, or around 3 per year. He estimated that he had performed 2-3 per year since 1995, and a total of 50 finger replantation procedures in his career. Dr. Morse agreed that he had performed fewer replantation procedures in later years

because he had taken less trauma calls at hospitals and because the two hospitals where he took calls were less likely to receive amputation injuries. According to Dr. Morse, "in the majority of cases [of replantation,] even industrial accidents, most people only have one amputated digit. This [issue] obviously only occurs when people have multiple amputated digits." In response to this testimony, defense counsel asked Dr. Morse how many multi-digit replantations he had performed, and Dr. Morse estimated no more than four. All of these multi-digit replantation procedures occurred prior to 2011.

Dr. Morse estimated that there were between 7 and 15 physicians "comfortable performing hand or finger replant surgery" in the metropolitan Washington, D.C. area, in which he operated, and agreed that there is only a "small community of people . . . capable of performing this procedure." He further testified that while he was on call at one of the larger hospitals, there were only three or four surgeons comfortable with performing finger replantation procedures. Dr. Morse agreed with defense counsel that "there's only a few people in each city in this nation that can do this surgery[.]"

In Dr. Morse's opinion, Cochran's amputated long and index fingers were replanted on the wrong fingers; this conclusion was based on post-operative x-rays

and photographs and the report of the latent print examiner. In his opinion, Dr. Howell "had the time and the responsibility to the best of his ability to put the correct amputated part in the correct position." Dr. Morse agreed that in some cases it would not be a violation of the standard of care to replant an amputated digit in a different position if it was "predetermined" and "discuss[ed] with the patient ahead of time." But in this case, according to Dr. Morse, Dr. Howell violated the standard of care because the amputated parts were attached to the opposite digits unintentionally. Dr. Morse reached the conclusion that it was unintentional because he did not "have the impression from reading [Dr. Howell's] operative note that that was his intention," and he would expect a surgeon to include the intentional transposing of the digits in his operative note. Instead, Dr. Morse testified that "from reading [Dr. Howell's] operative note . . . [Dr. Howell] believed that he put the amputated index part on the index digit . . . [and] the amputated long digit in the long digit location." Dr. Morse stated that he did not come to this conclusion "in a vacuum," but also in light of "information . . . that the patient is concerned that he might have placed the amputated parts in the wrong location. And [Dr. Howell] does not acknowledge that he did that [purposefully]."

6

Dr. Morse testified that there are two methods he uses to determine which amputated part "belongs" to which digit:

> So I would look at the configuration of the digits that are remaining and the configuration of the bone of the proximal aspect or the closest to the amputated part of the amputated pieces, the amputated part of the digits, to see what aligns better with the bones that remain in the digits that are still attached to the hand. And one can also measure the entire length of the metaphyseal shaft, which is the bone between one joint and the second joint, to give you an idea of which digit you're working with.

After this explanation, defense counsel asked "is there a standard of care for making such a determination," to which Dr. Morse responded, "I don't know the answer to that question." Dr. Morse subsequently confirmed that he believed that "the standard of care require[s] a physician to determine to the best of his ability which part goes where using a method that is reasonable[.]" Dr. Morse testified that he did not see or have any issues with Dr. Howell's inability to attach the ring finger and that his treatment of the ring finger specifically was within the standard of care.

After deposing Dr. Morse, the defendants filed a supplemental brief in support of their motion for summary judgment, arguing that Dr. Morse is unqualified under OCGA § 24-7-702 (c). Following a hearing, the trial court denied the defendants' motion, finding that Dr. Morse met the "standard with regard to the procedure at issue

7

in this case" based on Dr. Morse's testimony that he has worked as an orthopedic surgeon for 25 years,[3] that 75 percent of his practice is hand-surgery related, and that he has handled approximately 50 cases of replantation of severed fingers during his career. The trial court certified its order for immediate review, and this Court granted the defendants' application for interlocutory appeal. The defendants contend that the trial court erred in finding that Dr. Morse was qualified to testify under OCGA § 24-7-702 (c) because Dr. Morse (a) lacks the requisite experience and (b) lacks sufficient knowledge of the standard of care for multi-digit replantation procedures, as admitted in his deposition.

(a) Pursuant to OCGA § 9-11-9.1 (a), the plaintiff in a professional malpractice action is required to attach to the complaint the "affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim." Subsection (e) of OCGA § 24-7-702 mandates that an expert must meet the requirements of OCGA § 24-7-702 ("Rule 702") "in order to be deemed qualified to testify as an expert by means of the affidavit required under Code Section 9-11-9.1." Under Rule 702, "it is

---

[3] This appears to be a scrivener's error as Dr. Morse is a plastic surgeon not an orthopedic surgeon.

8

the role of the trial court to act as a gatekeeper of expert testimony." *Yugueros v. Robles*, 300 Ga. 58, 67 (793 SE2d 42) (2016). "The issue of the admissibility or exclusion of expert testimony rests in the broad discretion of the court, and consequently, the trial court's ruling thereon cannot be reversed absent an abuse of discretion." (Citation, punctuation and footnote omitted.) *MCG Health v. Barton*, 285 Ga. App. 577, 580 (1) (647 SE2d 81) (2007) (applying abuse of discretion standard to motion to exclude expert's testimony on summary judgment under predecessor to Rule 702). See also *Nathans v. Diamond*, 282 Ga. 804, 806 (1), n.8 (654 SE2d 121) (2007) (when a trial court holds a hearing on whether an expert is properly qualified, the trial court's finding regarding an expert's qualification will only be reversed on appeal if the trial court abused its discretion in making its ruling).

Rule 702 (c) (2) (C) (i) "requires that an expert in a medical malpractice case generally must be 'a member of the same profession' as the defendant about whose alleged malpractice the expert will testify." *Dubois v. Brantley*, 297 Ga. 575, 581 (2) (775 SE2d 512) (2015). Additionally, Rule 702 (c) (2) (A) and (B) "provide that an expert on the standard of care in a medical malpractice case must have a particular sort of knowledge and experience, either by virtue of having recently practiced the profession . . . or having recently taught it." Id. See also *Hankla v. Postell*, 293 Ga.

9

692, 694-695 (749 SE2d 726) (2013) (expert must have actual knowledge and experience in the relevant area through active practice or teaching in three of the five years preceding the care at issue). Pertinent to this case, Rule 702 (c) (2) (A) provides:

> [I]n [medical] malpractice actions, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert:
>
> . . .
>
> had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:
>
> > (A) The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure . . . or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue[.]

OCGA § 24-7-702 (c) (2) (A). According to the defendants, "[t]he scope of the alleged negligence is limited to an aspect of replantation surgery that is only present

10

in multi-digit, not single-digit, procedures." And, because Dr. Morse has performed only four multiple-finger replantation procedures in his career, none of which occurred in the five years preceding Cochran's procedure, his testimony does not satisfy the requirements of Rule 702 (c) (2) (A).

As the Supreme Court has explained, and as stated in the trial court's order, "by the plain terms of the statute, the pertinent question is whether an expert has an appropriate level of knowledge in performing the procedure . . . not whether the expert himself has actually performed . . . it." (Citation and punctuation omitted.) *Dubois*, 297 Ga. at 585 (2). An expert must have "knowledge suitable or fitting for the rendering of the particular opinions to which the expert proposes to testify." Id. "Rule 702 (c) (2) (A) and (B) refer explicitly to the gatekeeper role of the trial court, speaking in terms of an appropriate level of knowledge, *as determined by the judge*." (Citation and punctuation omitted; emphasis in original.) Id. at 586 (2). This "gatekeeper role contemplates that a trial court will conduct an inquiry that is flexible[.]" (Citation and punctuation omitted.) Id.

While Dr. Morse had only performed a handful of multi-digit replantation procedures, all of which took place prior to 2011, we must keep in mind that "the amount of 'active practice' necessary for a proposed expert to be qualified under

11

[Rule 702] (c) (2) (A) involves practice in the witness' area of expertise 'with sufficient frequency to establish an appropriate level of knowledge, *as determined by the judge*." (Emphasis supplied.) *Zarate-Martinez v. Echemendia*, 299 Ga. 301, 306 (2) (a) (788 SE2d 405) (2016). And "sufficient frequency to establish an appropriate level of knowledge" must take into account how frequently the procedure is performed — a common, routinely performed procedure might entail a higher "frequency" to be considered "sufficient" as opposed to a rare procedure not often performed. Put plainly, a surgeon necessarily will have performed a smaller number of rare procedures than he or she will have performed routine procedures. Based on Dr. Morse's testimony, multi-digit replantation procedures are far less common than single-digit replantation procedures. Here, considering the allegations of negligence in the complaint and Dr. Morse's testimony regarding his medical background, experience, and expertise, as well as the flexible nature of the trial court's inquiry as gatekeeper, we cannot conclude that the trial court abused its discretion in determining that Dr. Morse possessed an appropriate level of knowledge in performing the procedure at issue.

(b) As to the defendants' argument that Dr. Morse admitted he lacks sufficient knowledge of the standard of care, the defendants failed to raise this theory below.[4] "Each party has a duty to present his best case on a motion for summary judgment." *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 828 (2) (573 SE2d 389) (2002). Thus, "[a]ppellate courts do not consider whether summary judgment should have been granted for a reason not raised below because, if they did, it would be contrary to the line of cases holding that a party must stand or fall upon the position taken in the trial court." (Citation and punctuation omitted.) *Wellons, Inc. v. Langboard, Inc.*, 315 Ga. App. 183, 186 (1) (726 SE2d 673) (2012). See also *Designs Unlimited v. Rodriguez*, 267 Ga. App. 847, 847-848 (601 SE2d 381) (2004). Accordingly, we will not consider this argument for the first time on appeal.

*Judgment affirmed. Barnes, P. J., and Hodges, J., concur.*

---

[4] While the trial court's order indicates that a hearing was held on the defendants' motion for summary judgment, there is no transcript of the hearing in the record. Because there is no transcript, we cannot tell whether the defendants raised this argument during the hearing.