**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**July 1, 2021**

# In the Court of Appeals of Georgia

A21A0076. MEKOYA v. CLANCY et al.

A21A0077. UNIVERSITY HEALTH SERVICES, INC. v. CLANCY et al.

BARNES, Presiding Judge.

After Christopher Shawn Clancy suffered a pericardial effusion resulting from a microperforation caused by a pacemaker lead, Clancy and his wife, Linda G. Clancy ("appellees") filed the instant action against Dr. Abiy Mekoya and University Health Services ("UHS"). The appellees essentially alleged that the professional negligence of Dr. Mekoya and certain other medical staff in failing to timely diagnose and treat the microperforation resulted in pain and suffering to Clancy, emergency surgical intervention, and other complications. The trial court denied Dr. Mekoya and the

UHS's motions for summary judgment, and this Court granted interlocutory review from the denials of their motions, resulting in these appeals.

In Case No. A21A0076, Dr. Mekoya challenges the trial court's exercise of its discretion in the denial of his motion to exclude the standard-of-care opinion of the appellees' expert, and also its denial of his motion for summary judgment based on his assertion that the appellees failed to offer expert testimony, to a reasonable degree of medical probability, that Dr. Mekoya's alleged delay in diagnosing pericardial effusion proximately caused any harm. In Case No. A21A0077, UHS also challenges the denial of its motion for summary judgment, contending that there remain no genuine issues of material fact regarding the negligence theories, proximate causation, and the reliability of the expert's testimony. UHS also contends as error the trial court's reliance on certain inadmissible evidence. For the reasons set forth below, we affirm the trial court's judgment in both appeals.

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts . . . warrant judgment as a matter of law." (Citation omitted.) *Anthony v. Chambless*, 231 Ga. App. 657, 658 (1) (500 SE2d 402) (1998). An appellate court's "review of the grant or denial of summary judgment is de novo, and

2

we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." *Abdel-Samed v. Dailey*, 294 Ga. 758, 760 (1) (755 SE2d 805) (2014). Consequently, we construe the evidence in both of these cases in the light most favorable toward the plaintiffs.

So viewed, the facts demonstrate that on July 26, 2015, Clancy visited the emergency department of UHS and was admitted with a diagnosis of sick sinus syndrome. Dr. Peter Bigham, a cardiologist, implanted a pacemaker in Clancy's chest on July 28, and he was discharged on July 29, 2015.[1] On August 3, 2015, Clancy visited Dr. Bigham's office complaining about chest discomfort and pain, and was advised to go to UHS's emergency department, which he did. Clancy was evaluated by a nonparty emergency room physician and referred to a hospitalist, Dr. Heera Motwani,[2] who, based on images from a CT and blood work, admitted Clancy with a diagnosis of a pulmonary embolism ("PE"), a blood clot in the lungs. The recent pacemaker placement was noted, and because of the PE diagnosis, Clancy was treated

---

[1] Dr. Bigham is employed by a cardiology practice, University Cardiology Associates, a subsidiary of UHS. Through an arrangement between the practice and UHS, he provided "a certain amount of hospital duty," including performing procedures, and providing on-call or consultation services to UHS.

[2] Dr. Motwani was later dismissed from the action with prejudice, and is not a party to the appeal.

3

with anticoagulants, also known as blood thinners, which prevent further clot formation. According to Dr. Motwani, there were no symptomatic indications of a pericardial effusion (fluid accumulation in pericardial space resulting from pericarditis) or cardiac tamponade (when the fluid in pericardial space compresses the heart ) at that time, so he did not consider either in his differential diagnosis. Dr. Motwani testified that other than the nature of the pain Clancy was experiencing, "there was no other suggestion of pericarditis [,inflamation of the pericardium membrane surrounding the heart,] based on the laboratory finding and the exam." He also testified that he also ruled out any complications associated with Clancy's recent pacemaker placement.

Dr. Mekoya, also a hospitalist,[3] whose shift was from 7:00 a.m. until 7:00 p.m., first assessed Clancy the next day, on August 4. His initial notes on Clancy's progress were entered at 1:55 p.m., but Dr. Mekoya testified that it was likely not the first time he would have seen Clancy that day; it would have been "earlier than this time." Dr. Mekoya examined Clancy, noted his history, his continued pleuritic chest pain ("pain

---

[3] Dr. Motwani recounted that the duties of the hospitalist included, "to evaluate these patients, diagnosing them, treat them and . . . make a safe disposition with the help of the health care team which includes the social worker, the case managers, you know, and the family as well."

4

that gets worse during breathing, coughing, or chest movement"), and his PE diagnosis, and he continued the anticoagulant treatment with blood thinners. He also noted on Clancy's chart that he had discussed his treatment plan with Clancy's wife and daughter.

That same evening of August 4, at approximately 7 p.m., Dr. Bigham visited Clancy and noted that he was being treated for a PE, and was receiving blood thinners and pain medication. After speaking with Clancy and his wife, he examined Clancy and, according to Dr. Bigham, "it seem[ed[ like [the doctors] were on the right track with their medications, [and] their diagnosis." Dr. Bigham, however noted on Clancy's chart:

> While not formally consulted, I am struck by the degree of discomfort compared to the reported findings. There is also of a report of a low heart rate in the ER. May consider pacemaker evaluation by Boston Scientific for pacemaker function. May consider repeat echo for pericarditis/pericardial effusion, although no rub.

He testified, however, that despite the suggestion in his note, had he believed that Clancy was suffering from pericarditis or a percardial effusion, he would have informed Dr. Mekoya or the on-call hospitalist.

Dr. Mekoya next saw Clancy on August 5 at 10:52 a.m., and noted no significant changes in Clancy's symptoms. Clancy was still experiencing pleuritic chest pain and nausea, but Dr. Mekoya charted that the pain was better. Dr. Mekoya testified that he read Dr. Bigham's note, but assumed that Dr. Bigham's note referred to a "plan in the future . . . if things change."

That evening, at approximately 6:30 p.m., Clancy experienced low blood pressure, and a registered nurse, Jennifer Brooks Edwards, paged Mekoya twice "to advise of lowering BP." When she received no response, she advised the charge nurse, and "continued to monitor" Clancy's blood pressure. That night, Clancy was prescribed intravenous fluids to address his low blood pressure by the on-duty hospitalist. The next morning, August 6, Edwards was concerned that Clancy's blood pressure remained low, and that he also had a low pulse rate, which, according to Edwards, was unusual for someone with a pacemaker.

Dr. Mekoya ordered an evaluation of Clancy's pacemaker, an EKG, which was abnormal , and a consult with a non-party cardiologist, Dr. Kellie Lane. Based on her review of Clancy's chart and his symptoms, Dr. Lane suspected that he was suffering from pericarditis and an associated cardiac tamponade. Ensuing tests revealed that a pacemaker lead tip had caused a microperforation of the pericardium with resultant

6

pericarditis, and pericardial effusion, which, in turn, had been enhanced by the prescribed anticoagulants.[4] Dr. Lane told the family that the pericarditis was misinterpreted as a PE. Clancy received further treatment – including the surgical interventions of a pericardiocentesis (insertion of needle in pericardial space to remove fluid ) and pericardial window (removal of part of the pericardium ) – to address these issues. Clancy was discharged on August 12, 2015, but continued to experience further complications from his hospital stay.

The appellees brought the underlying action for medical malpractice and loss of consortium, alleging, in relevant part, that UHS's nursing staff and Dr. Mekoya deviated from the standard of care in multiple ways, which resulted in a failure to timely or accurately diagnose his medical condition. The appellees essentially claimed that Clancy was misdiagnosed with a PE, when instead he had pericarditis that was caused by a pacemaker lead microperforation into the pericardium, which resulted in surgical and emergent interventions and continuing complications.

The appellees sought damages for injuries alleged to have been sustained from the procedures, and the associated complications, including temporary renal failure,

---

[4] Dr. Bignham's progress notes entered on August 10 reflected that the "[e]ffusion accumulated over several days to tamponade (bleeding enhanced by anticoagulants, bleeding from pericarditis.)"

7

the additional medical/surgical procedures, a longer and more complicated hospital stay, and the resulting pain, and physical limitations.

Attached to the complaint was the affidavit of Dr. Lisa A. Gillespie, an internal medicine physician and hospitalist. Dr. Gillespie averred that the minimum standard of care for a hospitalist "in like and similar circumstances" as Clancy's required an evaluation and work-up consistent with symptoms, an appropriate medical and surgical history, radiologic studies, and consultations with specialists. She detailed the various instances in which Dr. Mekoya and UHS deviated from the standard of care, including failing to recognize that Clancy's symptoms were inconsistent with a PE but were more closely associated with complications from his pacemaker, failing to recognize that the chest CT was suggestive of chronic emboli, failing to order the proper radiologic tests, failing to order certain coronary tests, failing to obtain a pulmonary or cardiac consult, and failing to act upon Dr. Bigham's progress report which indicated inconsistencies in his diagnosis and symptoms and requested further cardiac evaluation.

Dr. Gillespie opined that

the acts and omissions of the part of University Hospital . . . and [Dr. Mekoya] . . . resulted in harm to Mr. Clancy. As a result of these failures

8

and breaches in the standard of care, Mr. Clancy experienced a delay in diagnosis and treatment of his pericardial effusion related to pacemaker lead placement and significantly contributed to Mr. Clancy's complications, continued pain and extended hospitalization.

In addition to Dr. Gillespie, the appellees submitted the affidavit of cardiologist, Dr. Randal Zusman, who also proffered his standard of care opinion. A board-certified cardiologist since 1974 and associate professor at Harvard Medical School and Massachusetts General Hospital, Dr. Zusman averred his familiarity with "the standard of care applicable to physicians as well as acute care hospitals in the provision of medical and nursing services to patients who present to a hospital like University Hospital with symptoms or complaints similar to those as being experienced by Mr. Clancy on August 3, 2015." According to Dr. Zusman, Dr. Mekoya breached the standard of care as early as August 4, when Clancy came to the hospital with chest pains, opining that "all of the information Dr. Mekoya required to make the diagnosis of pericarditis was available to him." He recounted several other specific instances in which he believed Dr. Mekoya had deviated from the standard of care, including diagnosing Clancy with an acute PE and treating him with anticoagulants, failing to note Clancy's change of condition as he developed renal

9

dysfunction and failure, failing to respond to repeated pages from nurses to evaluate Clancy, and failing to request pulmonary and cardiology consults.

Following discovery, UHS and Dr. Mekoya moved for summary judgment. They alleged that the appellees had not established that any alleged negligence by UHS or Dr. Mekoya proximately harmed Clancy. Dr. Mekoya also moved to exclude the standard-of-care opinions of Dr. Zusman on the ground that Dr. Zusman lacked the qualifications required by OCGA § 24-7-702 ("Rule 702"). The trial court denied the motions in a single order, finding that as to UHS's motion, "there are genuine issues of material facts concerning both the alleged negligence of [UHS] and the causal connection between [UHS's] negligence and Plaintiffs' injuries." As to Dr. Mekoya's motion, the trial court held that "genuine issues of material fact exist concerning Mekoya's alleged negligence. These factual disputes prohibit the entry of summary judgment in this case as to Mekoya." The trial court also denied Dr. Mekoya's motion to exclude Dr. Zusman's standard-of-care opinion, and expressed that

> [a]lthough Dr. Mekoya is a hospitalist and Dr. Zusman is a cardiologist, there is ample evidence to show that the knowledge and recent experience of Dr. Zusman is sufficient to allow him to reliably give opinions about the care that Dr. Mekoya provided to Clancy. Based on

10

Dr. Zusman's affidavit and deposition testimony, this Court finds that Dr. Zusman has the necessary knowledge and experience to give standard of care testimony concerning Dr. Mekoya's potential negligence as defined under [OCGA § 24-7-702.]

The trial court certified the order for immediate review, we granted the application for interlocutory appeal, and these appeals ensued.

Case No. A20A0076

1. Dr. Mekoya first contends that the trial court abused its discretion in denying his motion to exclude Dr. Zusman's standard-of-care opinions. According to Dr. Mekoya, pursuant to Rule 702, Dr. Zusman – a cardiologist – lacked the required knowledge and experience in the area of hospitalist medicine to render standard-of-care opinions against Dr. Mekoya.

This Court reviews a trial court's ruling admitting or excluding expert testimony only for an abuse of discretion. *Aguilar v. Children's Healthcare of Atlanta*, 320 Ga. App. 663, 664 (739 SE2d 392) (2013). In the exercise of its discretion, Rule 702 "requires a trial court to sit as a gatekeeper and assess the reliability of proposed expert testimony" before admitting it into evidence. (Citation and punctuation omitted.) *Dubois v. Brantley*, 297 Ga. 575, 580 (2) (775 SE2d 512) (2015).

11

The usual standard for the admissibility of such testimony is found in Rule 702 (b): If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if:

(1) The testimony is based upon sufficient facts or data;

(2) The testimony is the product of reliable principles and methods; and

(3) The witness has applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact. OCGA § 24-7-702 (b).

Id.

Rule 702 (c) (2) provides additional guidance specific to a medical malpractice action. It requires

among other things, that at the time the act or omission is alleged to have occurred, the expert had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given. OCGA § 24-7-702 (c) (2). Such knowledge and experience must result from the expert having been regularly engaged in either the active practice of such area of specialty of his or her profession for at

12

least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue, OCGA § 24-7-702 (c) (2) (A), or the teaching of his or her profession for at least three of the last five years as an employed member of the faculty of an educational institution accredited in the teaching of such profession, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in teaching others how to perform the procedure, diagnose the condition, or render the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue. OCGA § 24-7-702 (c) (2) (B). The statute also requires that the expert be a member of the same profession as the defendant. OCGA § 24-7-702 (c) (2) (C) (i).

(Punctuation omitted.) *Graham v. Reynolds*, 343 Ga. App. 274, 277 (2) (807 SE2d 39) (2017). Rule 702 "ensure[s] that an expert on the standard of care in a medical malpractice case has an informed basis for testifying about the standard of care that presently prevails in the specific profession and specialty at issue" and "has significant familiarity with the area of practice in which the expert opinion is to be given." (Citation and punctuation omitted.) *Dubois*, 297 Ga. at 586 (2). "[E]ven if an expert is generally qualified as to the acceptable standard of conduct of the medical

13

professional in question, the expert cannot testify unless he also satisfies the specific requirements of [Rule 702] (c) (2)." (Citation and punctuation omitted.) Id at 586 (2), n. 12.

Dr. Mekoya challenges not only Dr. Zusman's area of practice, but also his practical experience during the relevant time period – which he argues is "three of the last five years *preceding the alleged negligent care*."(Emphasis in original.) He argues that Dr. Zusman's lack of any experience actually practicing hospitalist medicine and sporadic interactions and consultations with hospitalists does not satisfy the Rule 702 requirements with regard to proffering admissible standard-of-care opinions.

Admittedly, Dr. Zusman had never practiced as a hospitalist. In his role as Chief of the Division of Hypertension and Vascular Medicine at Massachusetts General, he primarily treated patients with hypertension. Although he saw "60 to 75 percent" of his patients for hypertension, Dr. Zusman testified that he also treated "people with the whole spectrum of heart disease, coronary artery disease, atrial fibrillation, hypocholesterolemia[, and] [a]rrhythmias of other sorts. In particular with reference to [the Clancy case], pericardial disease [and] [p]atients who undergo surgical procedures or interventional procedures." He further testified that his

14

nonclinical cardiology tasks included "teaching and the supervision of interns, residents, and fellows." The appellees note that Dr. Zusman does not have privileges to perform a pericardiocentesis, and Dr. Zusman admitted that he had last performed the procedure in the "79 to 80 academic year" and that he had last supervised the procedure "more than ten years ago." However, there was evidence that, in his current role at Massachusetts General, Dr. Zusman acted in a consultant capacity to access the need for a pericardiocentesis procedure, and testified that he had done so as recently as 2018. As to the frequency of his consultant role in an emergent situation to access suspected pericarditis, he testified that he acted in that capacity "maybe once a year where there's a suspicion, but perhaps between two and five times per year in a patient with documented pericarditis where there's been the need to evaluate and treat and/or intervene because of the pericardial disease." He was also called to consult in the emergency room "up to five times per year" for suspected pericardial effusions.

As explained in *Dubois*,

> [n]o doubt, the simplest way to demonstrate that an expert has an appropriate level of knowledge in performing a procedure or teaching others how to perform a procedure is by proof that the expert actually has done these things himself. Moreover, it may be that, in many cases,

15

if an expert has not actually performed or taught a procedure himself, he will be found lacking an appropriate level of knowledge. But by the plain terms of the statute, the pertinent question is whether an expert has an appropriate level of knowledge in performing the procedure or teaching others how to perform the procedure, not whether the expert himself has actually performed or taught it.

(Citations and punctuation omitted.) *Dubois*, 297 Ga. at 585. With that being so, "a medical doctor in one specialty may have the requisite knowledge and experience under OCGA § 24-7-702 (c) (2) to give expert opinion testimony regarding the acts or omissions of a medical doctor in another specialty." *Graham v. Reynolds*, 343 Ga. App. 274, 278 (2) (a) (807 SE2d 39) (2017). And, pertinent to that inquiry is whether the expert has "sufficient knowledge about [diagnosing the condition] — however generally or specifically it is categorized, so long as it is the [condition] that the defendant is alleged to have [diagnosed] negligently." *Dubois*, 297 Ga. at 587 (2). In this context, "the area of specialty is dictated by the allegations in the complaint, not the apparent expertise of the treating physician." *Toombs v Acute Care Consultants*, 326 Ga. App. 356, 360 (756 SE2d 589) (2014) (explaining that "the area of specialty in [that] case concern[ed] the standard of care applicable to [deep vein thrombosis

16

("DVT")] prophylaxis in a hospitalized patient who is at increased risk for DVT and [pulmonary embolism]").

The appellees alleged negligent acts and omissions including, but not limited to, failing to accurately, adequately, and timely assess, diagnose, monitor, and treat Clancy's condition, failing to "recognize and appreciate" that Clancy's chest pain and other symptoms were inconsistent with an acute PE diagnosis, failing to relate the chest pain to complications related to Clancy's recent pacemaker implantation, failing to recognize that Clancy's chest CT was suggestive of a chronic emboli, and failing to obtain appropriate consultations with specialists. The appellees did not allege that Dr. Mekoya was negligent in his capacity as a hospitalist, but that he had failed to properly assess and diagnose a specific medical condition. In his affidavit, Dr. Zusman opined that Dr. Mekoya had deviated from the standard of care in several regards, including diagnosing and treating Clancy with an acute PE, and treating him with anticoagulants, and failing to timely make the diagnosis of pericarditis. See *Cotten v. Phillips*, 280 Ga. App. 280, 287 (633 SE2d 655) (2006) (noting that the plaintiff did not allege "that [the doctor] was negligent in his performance of the total knee replacement surgery, only in his failure to assess the vascular issues involved,

17

particularly in light of [the plaintiff's] medical history. Therefore, the evidence in the record supports the trial court's determination that the area of practice in which the opinion is to be given is vascular surgery, which was [the expert's] specialty, and that [the expert] was qualified to give an opinion in that area.") As the Court explained in *Dubois*, in the exercise of its discretion, the trial court utilizes a "flexible" approach in the determining the expert's "appropriate level of knowledge" that is tailored not only to the expert's speciality, but to the nature of his opinion, and the alleged negligent act. *Dubois*, 297 Ga. 586-587 (2).

Here, considering the scope of the allegations of negligence in the complaint and the nature of Dr. Zusman's averments and testimony regarding his medical background, experience, and area of expertise, we conclude that the trial court did not abuse its discretion in determining "that [Dr. Zusman] had knowledge and experience in a practice or specialty relevant to [Dr. Mekoya's] alleged negligence." *Graham*, 343 Ga. App. at 279 (2) (b). See *Robles v. Yugueros*, 343 Ga. App. 377, 386 (2) (b) (807 SE2d 110) (2017) (finding that "the trial court was authorized to conclude that [radiologist] was qualified to give expert testimony about the accepted standard of medical care applicable to a physician interpreting the type of x-ray at issue here and to render an opinion whether [the emergency physician's] interpretation of [the

patient's x-ray] breached that standard of care"); *Cotten*, 280 Ga. App. at 282-284 (trial court did not abuse discretion in holding that vascular surgeon was qualified to testify as to orthopedic surgeon's failure to properly assess, monitor, and respond to patient's vascular condition during orthopedic treatment and surgery); *Mays v. Ellis*, 283 Ga. App. 195, 196-199 (1) (641 SE2d 201) (2007) (concluding that gastroenterologist was qualified to render opinion that OB/GYN — who performed surgery on patient based on OB/GYN's diagnosis that patient was suffering from pancreatitis — had committed negligence by misdiagnosing patient's pancreatitis; and that if timely diagnosed, patient's condition could have been treated nonsurgically); *MCG Health v. Barton*, 285 Ga. App. 577, 580-582 (1) (647 SE2d 81) (2007) (a medical doctor in one specialty may have the requisite knowledge and experience under Rule 702 (c) (2) to give expert opinion testimony regarding the acts or omissions of a medical doctor in another specialty).

2. Dr. Mekoya also challenges the denial of his motion for summary judgment, arguing that there is no expert testimony establishing causation to a reasonable degree of medical certainty. To that end, he contends that there is no evidence that his alleged breach of the standard of care caused Clancy's injuries. Dr. Mekoya asserts that the breached standard of care identified by Dr. Gillespie – diagnosing pericardial

effusion "sometime" on August 5, 2015 – could not have proximately caused Clancy's need for pericardiocentesis or pericardial window and his related subsequent complications and claimed pain and suffering. According to Dr. Mekoya, this was evidence that by the time he saw Clancy on August 5, the pericardiocentesis and associated claimed damages were unavoidable, and it could not be demonstrated to a reasonable degree of medical probability that the medical condition and complications could have been avoided.

On summary judgment, "the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case." (Citation and punctuation omitted.) *Ellison v. Burger King Corp*., 294 Ga. App. 814, 819 (3) (a) (670 SE2d 469) (2008); see OCGA § 9-11-56 (c). "If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue."(Citation and punctuation omitted.) *Ellison*, 294 Ga. App. at 819 (3) (a); see OCGA § 9- 11-56 (e).

> To establish a claim for medical malpractice, a plaintiff must prove that the defendant's negligence in the diagnosis and treatment of the plaintiff was the actual and proximate cause of the injuries he sustained. The causation element requires the plaintiff to establish to a reasonable

20

degree of medical certainty that the injury to the plaintiff would have been avoided in the absence of the alleged medical negligence.

(Citations and punctuation omitted.) *Hosp. Auth. of Valdosta/Lowndes County v. Fender*, 342 Ga. App. 13, 19 (1) (b) (802 SE2d 346) (2017), overruled in part on other grounds by statute as stated in *Quynn v. Hulsey*, 310 Ga. 473 (850 SE2d 725) (2020). See also *Walker v. Giles*, 276 Ga. App. 632, 638 (624 SE2d 191) (2005) ("To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained. In other words, a plaintiff must prove that the defendants' negligence was both the cause in fact and the proximate cause of his injury") (citations and punctuation omitted.)

With regard to

causation in a medical malpractice case[, it] must be proven through expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson. However, Georgia case law requires only that an expert state an opinion regarding proximate causation in terms stronger than that of medical possibility, i.e., reasonable medical probability or reasonable medical

21

certainty. Moreover, causation may be established by linking the testimony of several different experts and must be determined in light of the evidentiary record as a whole. And questions regarding causation are peculiarly questions for the jury except in clear, plain, palpable and undisputed cases.

(Citations and punctuation omitted.) *Hosp. Auth. of Valdosta/Lowndes County*, 342 Ga. App. at 19 (1) (b).

Dr. Mekoya contends that there was evidence that the pericardiocentesis could not have been avoided by August 5, the date he alleges Dr. Gillespie identified as when the breach of the standard of care occurred, and thus not attributable to his actions.[5] Dr. Zusman opined that "Dr. Mekoya breached the standard of care when he first took responsibility for [Clancy's] care on the morning of *August 4th*" and that at that time Dr. Mekoya had the information necessary to make a "diagnosis of pericarditis" and failed to do so (Emphasis supplied.). He further opined that to a reasonable degree of medical probability that as early as the August 4, had Clancy not

---

[5] But Dr. Gillispie also responded "yes" when asked whether, given the progressive nature of the bleeding . . . and the fact that this occurred in a confined space, to wit, the pericardial sac, would you expect that if Dr. Mekoya had . . . conducted the appropriate diagnostic tests to aid in that diagnosis, that the – that more probably than not that pericardiocentesis would have been avoided?

"been anticoagulated . . . I don't believe this all would have happened." According to Dr. Zusman, Clancy's injuries resulted from Dr. Mekoya "failing to make the proper diagnosis and then by failing to get the proper folks involved to provide assistance, [with the result that Clancy] was anticoagulated inappropriately, and that's what led to cardiac tamponade due to hemopericardia."

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.

(Citation and punctuation omitted.) *Johnson*, 294 Ga. at 77. Thus, despite the experts offering conflicting evidence regarding causation, it is the province of the jury to decide which testimony is most believable. See *Brooks v. Cellin Mfg. Co.*, 251 Ga. 395, 398 (306 SE2d 657) (1983). Applying the foregoing standards regarding causation, we conclude that the experts' testimony in this case presented a genuine issue of material fact as to whether the pericardiocentesis and attendant complications Clancy experienced could have been avoided if Dr. Mekoya had properly diagnosed the condition in compliance with the applicable standard of care. See *Walker*, 276 Ga. App. at 641(1) (concluding that a jury issue as to causation was presented in the

23

patient's medical malpractice action based upon combined expert testimony that the rupture of the patient's appendix could have been avoided if she had not been misdiagnosed upon her first admission into the hospital, and noting that rather than establishing that negligence affirmatively caused the ruptured appendix, "the standard applicable in medical misdiagnosis cases . . . only required [appellants] to come forward with some evidence showing that if appellees had abided by the standard of care, the rupture of [patient's] appendix would have been avoided"); *MCG Health*, 285 Ga. App. at 583-584 (3) (finding jury question regarding causation existed where the delayed diagnosis led to the loss of the patient's testicle; the fact that the medical expert could not identify the exact point in time in which the condition became unsalvageable did not render the testimony speculative).

Thus, as a genuine question of fact as to causation exists, summary judgment was precluded.

Case No. A21A0077

3. UHS also challenges the trial court's denial of its motion for summary judgment, contending that the trial court erred in considering any other negligence claims other than the two claims of negligence alleged by the appellees' experts. UHS asserts that the only two claims of its negligence for the trial court to consider, as

24

established by the evidence, were the failure to promptly contact a physician at or shortly after 6:00 p.m. on August 5, 2015, in response to hypotension, and the failure to advocate for the appellees' alleged request for a cardiology consult. Purportedly, as also asserted by UHS, these two claims were belied by testimony from the appellees own experts. Specifically UHS references the following testimony from Dr. Gillespie:

Q: Other than the criticism you voiced about the escalation of information to the doctor in the 6:00 to 7:00 p.m. range on August the 5th, do you have any other standard of care criticisms of the nursing care?

Dr. Gillespie: I - I don't have any. Like I said, based upon what I'm reading, it's the idea that the family is at the - because, again, I – I - the nurses versus the family. If the family was addressing it, that there was a need for a consult, that they wanted a consult and that . . . was being related to someone outside of the direct MD and that was a nurse, ultimately I would be just like they're addressing the issue with - about the blood pressure with the charge nurse. Then you'd be addressing, "I've got this family who continues to come to me that essentially says they need a consult and the doctors ignore them," because that's usually what leads to a call by the chief nursing officer, the CMO, that's escalating care to get the family what they want to prevent any ongoing issues.

25

They also reference responses made during Dr. Zusman's deposition testimony, including the following:

Q. Doctor, do you feel you are competent to offer standard of care opinions regarding the nursing care on the med-surg floor at University Hospital in 2015?

Dr. Zusman. No, I don't think I'm going to offer standard of care opinions about the nurses.

Q. Okay. So at the trial of this case you do not intend to offer any opinions that any of the nurses fell below the standard of care in their care and treatment of Mr. Clancy, is that correct?

Dr. Zusman. Well, the one - the one issue I guess I should mention is the nurses noted there was some, an inability to reach Dr. Mekoya when Mr. Clancy's blood pressure was low. And that they twice tried to page him and there was no answer. And I believe they then went to the nurse manager or charge nurse on the floor to report their inability to do so and then eventually they got to Dr. Chan. So it was their responsibility under those circumstances to pursue, . . . a physician's input into what should be done to or for Mr. Clancy. And I believe that that would be sort of standard of care.

Thus, based in part on this testimony, on motion for summary judgment UHS asserted that the appellees' claim regarding the UHS's nursing staff's failure to

properly respond to a drop in Clancy's blood pressure failed for lack of causation because by the time of the alleged negligence, nothing could have been done to avoid the complications that followed. As did, UHS asserted in the motion, the appellees' claim that UHS's nursing staff failed to escalate the appellees' requests for a cardiology consult. According to UHS, appellees' expert testimony did not establish within a "degree of medical certainty that the alleged negligence caused or contributed to [Clancy's] alleged injuries."

In denying UHS's motion for summary judgment, the trial court rejected UHS's "narrow construction" of the appellees' negligence claims against the hospital and instead noted that the appellees had put forth other allegations of negligence. The other claims identified by the trial court, and alleged by appellees, included the "failure to review and act upon Dr. Bigham's progress note, which indicated that Clancy's symptoms were disproportionate to his diagnosis and requested further cardiac evaluation," and the "failure to ensure timely compliance with policies, procedures, and/or protocols to minimize and prevent harm to patients, including Clancy."

Indeed, in their response to UHS's motion for summary judgment, to establish that UHS breached the standard of care, the appellees presented evidence that as early

as August 4, members of Clancy's family repeatedly and with no avail, requested a cardiology consult, and continued to do so as his condition deteriorated. The family further testified that their repeated request to UHS staff for a hospitalist to attend to Clancy as his conditioned worsened were also ignored.

The appellees' experts, Dr. Gillespie and Dr. Zusman, both testified that UHS's failure to adequately respond to Clancy's emergent medical condition in various ways, including not responding to the family's repeated requests for a cardiac consultation or responding appropriately to his declining medical status were breaches of the standard of care. Dr. Gillespie's testimony reflected that she agreed that the standard of care would require "notification of the next higher authority of the request made by the family, and if that did not yield results, moving on up the chain of command to the next higher authority in an effort to achieve that[.]" Dr. Zusman further opined that, "[t]o the extent that [the nurses] failed to actually reach [Dr. Mekoya] they fell below the standard of care. Or the hospital fell below the standard of care."

Edwards, a registered nurse at UHS, acknowledged that nurses can request consultations based on a patient's symptoms and their judgment, and would ordinarily make such request to the hospitalist. According to Edwards' testimony, patients can

28

also request consultations, at which point the nurse should notify the hospitalist of the request. According to the family, the UHS staff did not make the requests.

As noted previously, as to proximate cause, similar to his testimony as to Dr. Mekoya's alleged negligent delay in properly diagnosing Clancy and acquiring a consultation, Dr. Zusman expressed that the UHS staff's negligent delay and failure to intervene or to obtain consultations or appropriate medical care led to the worsening of Clancy's condition, resulting surgeries, and other complications. Dr. Zusman affirmed that "to a reasonable degree of medical probability that as early as the 4th, the end result and procedures which Mr. Clancy had to go through could not have been avoided[.]" Dr. Zusman further testified that had UHS staff followed the standard of care and the proper and appropriate consults been obtained, such actions "would have changed the course of [Mr. Clancy's] hospitalization," as the problem would have been recognized, and immediate reversal of anticoagulation would have occurred, which would have prevented Clancy's cardiac complications, including cardiac tamponade.

It is important to note that while "a summary judgment cannot be obtained by a movant which rests entirely on opinion evidence, a summary judgment may be successfully contested by use of opinion evidence." (Citations omitted.) *Equity Nat.*

*Life Ins. Co. v. Shelnutt,* 128 Ga. App. 849, 851 (3) (198 SE2d 350) (1973) (physical precedent only). Further, as this Court has held, summary judgment "cannot deprive a party of the opportunity to have a trial of a genuine issue as to any material fact, and it is indeed a great responsibility to say that 'in truth there is nothing to be tried.'"*Holland v. Sanfax Corp.*, 106 Ga. App. 1, 5 (1) (126 SE2d 442) (1962). To that end, the jury is tasked with that responsibility in the making of

> [c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts . . . [rather than] a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.

(Citation and punctuation omitted.) *Johnson*, 294 Ga. at 77.

Here, the trial court rightly refused to make such determinations. Thus, construed in the light most favorable to the appellees, we cannot find, as a matter of law "that there is no evidence sufficient to create a jury issue on at least one essential element of [the appellees'] case." *Lau's Corp. v. Haskins*, 261 Ga. 491, 491 (405 SE2d 474) (1991). As such, summary adjudication of UHS's claims in this regard was also precluded. See *Walker*, 276 Ga. App. at 641-642 (1); *MCG Health,* 285 Ga. App. at 583-584.

4. In related enumerations of error, UHS contends that the trial court erred in denying its motion for summary judgment, *if in doing so,* it considered certain testimony from Dr. Zusman about the "avoidability" of the pericardial window; it considered Dr. Zusman's responses to leading questions; or it considered any evidence of any alleged statements made by healthcare providers regarding mistakes or apology.

> [I]t is well settled that the trial court on summary judgment need not limit its inquiry to the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits set out in OCGA § 9-11-56 (c). Those forms of evidence are not the exclusive means of presenting evidence on a motion for summary judgment. The trial court may consider *any material which would be admissible or usable at trial.*

(Citations and punctuation omitted; emphasis in original.) *Dalton v. City of Marietta*, 280 Ga. App. 202, 204 (1) (633 SE2d 552) (2006). And, unless otherwise shown, "[a] trial judge is presumed to have considered only legally admissible evidence." (Citations and punctuation omitted.) *1st Nationwide Collection Agency v. Werner*, 288 Ga. App. 457, 461 (4) (654 SE2d 428) (2007). See generally OCGA § 24-7-702 (requiring that the trial court act as "gatekeeper" of expert testimony.) Here, UHS's claims of error translate into mere conjecture and speculation about the trial court's

31

judgment, and as we are a Court for the correction of actual error, such claims warrant nothing for our consideration. See generally *Crippen v. Outback Steakhouse Intl.*, 321 Ga. App. 167, 170 (1) (741 SE2d 280) (2013) ("[T]his is a court for correction of errors of law committed by the trial court where proper exception is taken.")

*Judgments affirmed. Gobeil and Markle, JJ., concur.*